IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02536-MEH

CPI CARD GROUP, INC.,

    Plaintiff/Counter Defendant,

v.

MULTI PACKAGING SOLUTIONS, INC.,

    Defendant/Counter Claimant.

---

## ORDER RE: CLAIM CONSTRUCTION
---

**Michael E. Hegarty, United States Magistrate Judge**.

The parties have requested construction of four disputed terms contained in the patent at issue in this case. The parties' briefing is complete, and the Court held a tutorial and heard argument concerning these matters on August 29, 2017. The Court now makes the following findings and conclusions regarding the construction of the patent claims at issue.

**I.    Background**

According to the operative pleading, Plaintiff CPI Card Group, Inc. ("CPI") provides secure packaging products for various retail industries, including prepaid debit cards, which, in turn, include activatable point-of-sale cards. Among CPI's customers is American Express.

Defendant Multi Packaging Solutions, Inc. ("MPS") is a direct competitor of CPI and also is a supplier of secure card packaging to, among others, American Express. Like CPI, MPS provides its customers with secure packaging for activatable point-of-sale cards, including for example, the American Express Jackson Hewitt Tax Service Prepaid Card and the Target American Express Gift Card packages (collectively, the "Accused Products").

On April 16, 2013, the United States Patent & Trademark Office ("USPTO") issued the U.S. Patent No. 8,419,889 patent ("the '889 Patent"), entitled "Ultrasecure Card Package," to CPI as assignee. The '889 Patent is directed to methods for creating a secure package for a point-of-sale card that is designed to deter theft and unaccountable activation of activatable point-of-sale cards. CPI is the owner of all right, title, and interest in the '889 Patent.

CPI alleges that MPS has infringed, and may continue to infringe, claims of the '889 Patent by making, using, importing, offering to sell, and selling its card packaging products. Specifically, CPI contends that MPS used "ZED" machinery to create the same heat-sealing process used by CPI to seal its packaged prepaid debit cards. MPS counterclaims for declaratory judgment of non-infringement and invalidity of the '889 Patent. Two claims of the '889 Patent are at issue in this lawsuit:

<u>Claim One</u>: A method for producing a secure card package containing a point-of-sale activatable card, comprising:

> providing **a first panel and a second panel** each comprising paper stock and having a non-polymeric coated inner surface;
>
> printing a heat-activatable adhesive directly upon the non-polymeric coated inner surface of the first panel;
>
> allowing the heat-activatable adhesive to dry upon the non-polymeric coated inner surface of the first panel;
>
> **locating a point-of-sale activatable card between the inner surface of the first panel and an inner surface of the second panel**, after the step of allowing the heat-activatable adhesive to dry upon the non-polymeric coated inner surface of the first panel; and,
>
> **activating the heat-activatable adhesive, after the locating step, by applying heat and pressure only in a region substantially surrounding and offset from the point-of-sale activatable card** to enclose the point-of-sale activatable card in a **secure space** between the first and second panels.

<u>Claim Eighteen</u>: A method for producing a secure card package containing a point-of-sale

activatable card, comprising:

>   providing **a first panel and a second panel** each comprising paper stock and each having a clay coated inner surface and a clay coated outer surface;
>
>   printing a heat-activatable adhesive comprising polyurethane directly upon the clay coated inner surface of the first panel;
>
>   allowing the heat-activatable adhesive to dry upon the clay coated inner surface of the first panel;
>
>   **locating a point-of-sale activatable card between the inner surface of the first panel and the inner surface of the second panel**, after the step of allowing the heat-activatable adhesive to dry upon the coated inner surface of the first panel; and,
>
>   **activating the heat-activatable adhesive, after the locating step, by applying heat and pressure only in a region substantially surrounding and offset from the point-of-sale activatable card** to enclose the point-of-sale activatable card in a **secure space** between the first and second panels.

Compl. ¶ 16, Ex. A. The bold-faced type identifies the four terms in each claim disputed by the parties.

On December 8, 2016, the Court issued its Scheduling Order in a Patent Case. ECF No. 33. On January 11, 2017, the parties appeared before the Court for a hearing on CPI's motion for preliminary injunction, then came to an agreement acknowledging that MPS had stopped the accused process and would notify CPS if it ever intended to re-start the process. ECF Nos. 52, 54. The case has since proceeded in accordance with the Scheduling Order.

**II.     Legal Standards**

In construing patent claims, courts are guided by the precedent of the Federal Circuit. *See SunTiger, Inc. v. Scientific Research Funding Grp.*, 189 F.3d 1327, 1333 (Fed. Cir. 1999). A patent infringement claim involves a two-step analysis. First, the court "must determine, as a matter of law, the correct scope and meaning of a disputed claim term." *CCS Fitness, Inc. v. Brunswick Corp.*, 288

3

F.3d 1359, 1365 (Fed. Cir. 2002). Second, the properly construed patent claims must be compared to the accused device—that which allegedly infringes the plaintiff's patent—to determine whether the accused device contains all of the limitations of the claimed invention. *Id.*

The first step, claim construction, is a matter of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), the court "reaffirmed" the "basic principles of claim construction" as follows. First, "the words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" *Id.* at 1312–13. "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. *Id.* at 1313; *see also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").

"Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including "the words of the claims themselves, the remainder of the specification, the prosecution history [collectively, "intrinsic evidence"], and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (citation and internal quotation marks omitted). "Within the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction." *Id.* at 1318.

4

However, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* at 1315 (citation and internal quotation marks omitted); *see also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention."); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001) ("the written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format.").

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1320 (finding that the methodology adopted by *Tex. Dig. Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) "placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history.").

## III. Analysis

As set forth above, the parties dispute four distinct terms, each of which is found in Claims One and Eighteen, and the definition of a person of ordinary skill in the art of manufacturing secured packages, as relevant here. The Court will address each dispute in turn.

### A. Definition of Person of Ordinary Skill in the Art

Patent claims are to be construed through the eyes of a person of ordinary skill in the art in

question at the time of the invention. MPS contends that

> a person of ordinary skill in the art relating to the technology of the '889 Patent would have had a minimum of a bachelor's degree in packaging or a comparable field with approximately six months of internship or work experience in the field of creating, testing, and evaluating paperboard-based packaging with adhesives; or approximately four years of relevant industry experience in packaging; and familiarity with paper and paperboard packaging as well as converting and adhesives. Additional graduate education could substitute for professional experience, or significant experience in the relevant field described above could substitute for formal education.

Opening Br. 3. CPI counters that such person "would have at least four years' experience in the design, development, and manufacture of card packaging products, with educational training acting as a partial substitute for work experience." CPI argues that MPS' version requires "too much" knowledge in areas not applicable to the '889 "method" Patent, including testing and evaluating, and requires "too little" by allowing for a "mere intern" to qualify as a person of ordinary skill.

Following review of the relevant opinions and the '889 Patent, the Court finds that a person of ordinary skill in the art relating to card packaging products would have a minimum of a bachelor's degree in packaging or a comparable field, or at least four years' experience in the design, development, and manufacture of card packaging products, and familiarity with converting, adhesives, and paper and paperboard packaging.

### B. Disputed Terms

1. "<u>activating the heat-activatable adhesive, after the locating step, by applying heat and pressure only in a region substantially surrounding and offset from the point-of-sale activatable card</u>"

CPI argues that the term should be construed as, "applying heat and pressure to the heat-activatable adhesive to create or affect a bond only in a region substantially surrounding the card." That is, CPI argues the term "only" modifies "heat *and* pressure" together, so that heat and pressure

must be applied to the edges, and not to the middle, but if heat is also applied to the middle, such application is still covered by the patent.

MPS counters that the phrase "only in a region" modifies "applying heat and pressure." In other words, the invention claimed is a method that involves performing the step of activating the adhesive in a particular way, by applying heat and pressure *only* in a specified region. Thus, even if the entire inner surface of the package is covered with the adhesive, the card in the middle will not be damaged if heat and pressure are applied only to the edges to be bound.

CPI contends that MPS's construction of the patent improperly requires heat and/or pressure in an area surrounding the card, *but in no other places*. *See* Tr. 38: 11–14 ("this claim is also silent about what happens in the middle section of the card as long as it's not a combination of heat and pressure"). The Court agrees that a person of ordinary skill in the art would construe the patent as not limited to the application of heat and pressure only to the edges of the package.

First, the Court looks at the "ordinary and customary meaning" of the words in the disputed term. Unlike in other cases, the words here are not technical and require no specialized knowledge to understand their meanings. *See Bristol Co. Ltd. P'ship v. Bosch Rexroth, Inc.*, 684 F. Supp. 2d 1245, 1254 (D. Colo. 2001) (in some cases, the "ordinary meaning" of claim language as understood by a "person of skill in the art" may be "readily apparent even to lay judges," and claim construction in such cases "involves little more than the application of the widely accepted meaning of commonly understood words") (quoting *Phillips*, 415 F.3d at 1314).

MPS is correct that the parties essentially dispute whether the word "only" modifies the word "activating" (or, as CPI proposes, "to create or affect a bond") or the word "applying." A review of Claims 1 and 18 reveal that "only" modifies "activating." *See Vitronics*, 90 F.3d at 1582 (the

claims themselves provide substantial guidance as to the meaning of particular claim terms); *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms"). The parties agree that the adhesive contemplated by the claims may be activated only by the application of heat *and* pressure together. In addition, the parties agree that, for the subject package, the parts to be bonded are only the edges surrounding the "point-of-sale activatable card."

It can be argued that, if the patent contemplates adhesive being applied over the entire inner surface of the panels, then heat should not be applied to the entire package lest the adhesive become tacky in the middle and stick to the card. It is true, of course, that the patent contemplates the application of adhesive over the entire surface of a panel. *See* '889 Patent, Claims 6, 8, and 19. Certainly, under such circumstance, heat should not be applied to the entire package. However, the patent also allows for the adhesive to be "disposed only in the region substantially surrounding and offset from the point-of-sale activatable card" or, in other words, around the package's edges. *Id.*, Claim 17; *see also Phillips*, 415 F.3d at 1314 ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term."). Such allowance demonstrates that while heat and pressure together are necessary to activate the adhesive applied around the edges, they may also occur in other areas of the package without causing the package to become tacky. Thus, the patent demonstrates it is not necessary that heat and/or pressure be applied only around the edges; rather, heat and pressure together must be applied to activate the adhesive to form the bond around the card.

The specification supports this interpretation. Of the twelve embodiments described, nine

of them involve a "heat-activatable adhesive" and set forth the following method (or a similar reading of such method): "A card is located between the first and second panels and the first and second panels are ***heated under pressure to activate the adhesive in a region substantially surrounding the card*** [ ] to enclose the card between the panels." '889 Patent 1: 58–61, 2: 5–9, 2: 25–29, 2: 39–43, 2: 53–57, 2: 64–67, 3: 64–67, 4: 8–12, 4: 19–23 (emphasis added). Of course, the Court recognizes that only three of these embodiments (the last three described) are those encompassed in Claims 1 and 18, which provide for non-polymeric coated panels. But the language is the same for all such embodiments regardless of coating and application location of the adhesive.

Furthermore, in the "Detailed Description" of Figure 4, which (the parties agree) illustrates the patent contemplated in Claims 1 and 18, the specification provides: "The adhesive may be applied to substantially all of the inner surface 50, 70 of the panels 20, 30 [or][1] in selected areas." *Id.* 8: 24–26. MPS references a subsequent sentence in support of its position that heat and/or pressure must be applied only to the edges: "The heat activated adhesive can be applied to the entire surface of the panel, and only activated selectively by heating only the portions of the panels that are to be bonded." *Id.* 8: 50–53. However, as set forth above, Claim 17 and the specification at 8: 24–26 teach that the patent allows for application of the adhesive to only the "region substantially surrounding the card" (i.e., the edges of the package) and does not limit the application of heat or pressure to other parts of the package.

Therefore, to the extent that MPS's construction may be read to limit the patent's method

---

[1]The Court notes that it has discovered multiple typographical errors in the specification and finds here that this sentence must contain the word, "or," to make any sense and to conform to the requirements of the patent as a whole.

to applying heat and/or pressure solely on the edges of the package,[2] the Court concludes a person of ordinary skill in the art would find such construction too restrictive and not contemplated by the patent. To avoid such limitation, the Court construes the disputed term as: "After the locating step, applying heat and pressure together to activate the heat-activatable adhesive in a region substantially surrounding and offset from the point-of-sale activatable card."

2. "secure space"

MPS argues that the term should be construed as "a space defined by the coated inner surfaces of the first and second panels as a result of activating the heat-activatable adhesive." MPS contends that this construction is adapted from the plain language of the specification, and that CPI's version improperly reads a limitation discussed in a separate embodiment in the specification into the claim.

CPI counters that the term should be construed as "a space for the card that cannot be accessed without irreparably damaging one or both of the panels." CPI asserts that this "secure space" represents the entire object of the invention and should be construed in light of the goals and teachings of the '889 Patent. CPI argues that MPS' version improperly repeats language from elsewhere in the same claims.

The Court finds that MPS's version focuses on the word, "space," while CPI's version focuses on the word, "secure"; thus, neither version encompasses the full meaning of the term.

---

[2]During the hearing, MPS argued that Figure 4 demonstrated heat and pressure were to be applied only around the edges based on the drawing, which shows that the edges are pressed together around the card. However, the patent specifically states that "the drawings depict selected embodiments and are not intended to limit the scope of the invention" and "[i]t will be understood that embodiments shown in the drawings and described below are merely for illustrative purposes, may not be to scale, and are not intended to limit the scope of the invention as defined in the claims." '889 Patent, 4: 40–44.

Certainly, the parties agree that the patent's purpose is to "[p]ackage" a point-of-sale activatable card "with enhanced security that is capable of indicating unauthorized access to [the] packaged card" ('889 Patent 1: 44–45) and meant to "drastically hinder surreptitious access to the contents of the package." *Id.*, Abstract; *see also* Tr. 76: 17–25, 84: 3–5.

Mindful of this purpose, the language of the Claims, the content of the specification, and the legal standards under which I must construe the term as a person of ordinary skill in the art would understand it (*see supra*), the Court concludes that "secure space" may be construed as: "a space for the point-of-sale activatable card that cannot be accessed without damaging the panels, which have been adhered as a result of activating the heat-activatable adhesive."

        3.      <u>"a first panel and a second panel"</u>

MPS contends that this term should be construed as "two sections of material each in the desired size and shape for forming a side of the package." MPS believes this version will help a jury by clarifying that the first and second panels in the claims refer to sections in the size and shape desired for forming the card-containing package.

CPI counters that the term should be construed as its "plain and ordinary meaning to one of ordinary skill in the art." According to CPI, "a first panel and a second panel" are not terms of art, but are ordinary, every day words that require no construction. CPI argues that MPS's version would exclude an embodiment in the patent, which is improper.

Looking first at the ordinary and customary meaning of the words as I must, the Court finds that the word "panel" is fully explained in the "Detailed Description" portion of the specification:

> Panels in accordance with embodiments of the invention may be produced from sheets of feedstock that are then cut to the desired size by die cutting or other means known in the art. In some embodiments, a feedstock such as paperboard is fed from a feed roll past polymer application devices as are known in the art. The polymer

> may be, for example, extruded onto the feedstock. The adhesive may be applied over the polymer in the same manner, and the feedstock with polymer and adhesive layers may be rolled back up for transport to other facilities for further processing such as printing, die cutting, and/or production of the final packaging.

'889 Patent 5: 34–44. Under Figure 4, which involves non-polymeric coated panels, the specification provides, "The panels could be any suitable paper board or plastic stock, but one embodiment uses solid bleached sulfate paper stock that is clay coated on both sides (C2S SBS), or a similar coated board stock." *Id.* 8: 20–24.

After reviewing the specification and the Claims themselves, the Court finds that MPS's proposed construction is inconsistent with the patent's teaching. MPS's version requires that the provision of "a first panel and a second panel" in Claims One and Eighteen include "two sections of material each in the desired size and shape for forming a side of the package." The next step of the Claims requires printing the adhesive "on the inner surface of the first panel." Accordingly, MPS's construction would necessitate that the adhesive be applied directly to a section of material already cut "in the desired size and shape." However, as set forth in the specification's description above, "a feedstock such as paperboard [may be] fed from a feed roll" along which devices apply polymer and/or adhesive. *Id.* 5: 34–44; *see also* 8: 26–29 ("The embodiment of FIG. 4 can produce similar packages to the embodiments of FIGS. 1-3, but without the polymeric layers."). Thus, MPS's requirement that the panels provided first be cut "to the desired size and shape" contradicts the patent's allowance for panels to derive from a roll of paperboard on which adhesive is applied.

The Court concludes that the word "panel" is sufficiently defined in the patent and the term "a first panel and a second panel" is to be construed by its ordinary and customary meaning as understood by a person skilled in the art of secure packaging.

        4.      "<u>locating a point-of-sale activatable card between the inner surface of the</u>

<u>first panel and an inner surface of the second panel"</u>

MPS contends that this term should be construed as "positioning a point-of-sale activatable card between the panels, with the coated surfaces of the panels facing toward each other and toward the card." MPS argues this definition will help a jury by clarifying that the *locating* step is performed by positioning the card between the panels, with the coated surfaces of the panels facing toward each other and toward the card. MPS asserts that its proposal follows the specification most closely.

CPI counters that the term should be construed as the "plain and ordinary meaning to one of ordinary skill in the art." CPI contends that the terms "locating" and "between" are not terms of art, and MPS's version contradicts the patent by requiring that the coated surfaces be facing each other when the card is positioned adjacent to the panel.

The Court disagrees that the term may be construed simply by its plain and ordinary meaning. *See O2 Micro Int'l, Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) (a determination that a claim term "needs no construction" or has the "plain and ordinary meaning" may be inadequate when a term has more than one "ordinary" meaning). For example, the word "locating" is actually (and commonly known as) a passive verb rather than an active verb (i.e., "the store was located on Smith Street" rather than "Jones located his store on Smith Street"). Thus, MPS's proposal to construe "locating" as "positioning," for which "position"[3] is more commonly used as an active verb, is helpful.

The Court agrees, however, that the word "between" used in this context may be construed

---

[3]Position is defined as "an act of placing or arranging." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/position, last visited October 23, 2017.

13

by its ordinary and customary meaning and requires no further explanation. With that said, MPS's proposal to add the word "coated" to describe "surfaces" at this step may prove confusing to a jury, particularly because "coated" is used in the specification to describe only one embodiment (for polymeric coated panels) and the word does not appear in the "Detailed Description." Rather, the Court finds it consistent with the Claims and the specification to describe the surfaces as "inner" and "outer"; in this instance, the proper term would be "inner."

Regarding MPS's proposal to add " with the [inner] surfaces of the panels facing toward each other and toward the card," the Court finds that the specification repeatedly describes the patent's various embodiments (including the last three) as, "In this embodiment the inner surfaces of the panels face toward each other." '889 Patent 1: 55–56, 2: 2–3, 2: 22–23, 2: 36–37, 2: 50–51, 2: 64–66, 3: 61–62, 4: 4–5, 4: 16–17. Thus, the proposed words are not inconsistent with the patent. However, the Court agrees with CPI that MPS's proposal, as a whole, may be confusing to the jury in that it describes positioning the card between inner panels that are facing each other. Unfortunately, the proposal does not identify how close the panels are supposed to be to each other—inches apart or directly on top of each other—but, if the latter, there is no indication that MPS's proposed method would be practical or, even, feasible.

Rather, in view of the words surrounding the term and the content of the specification, the Court finds that a person of ordinary skill in the art would understand the disputed term as, "positioning a point-of-sale activatable card between the inner surface of the first panel and an inner surface of the second panel, which will face toward each other and toward the card."

## IV. Conclusion

"Claim construction is a matter of resolution of disputed meanings and technical scope, to

14

clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *O2 Micro*, 521 F.3d at 1362 (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). Based on all of the evidence and arguments submitted by the parties, this Court construes the four terms in Claims 1 and 18 of CPI's '889 Patent that are at issue in this case, as set forth above.

Dated and entered this 23rd day of October, 2017, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge